**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMPAIGN LEGAL CENTER<br>1101 14th St., NW, Ste. 400<br>Washington, D.C. 20005<br><br>     Plaintiff,<br><br>   v.<br><br>CORRECT THE RECORD<br>455 Massachusetts Avenue NW Ste. 660<br>Washington, DC 20001<br><br>HILLARY FOR AMERICA<br>P.O. Box 5256<br>New York, NY 10185-5256<br><br>     Defendants. | Civil Action No: 23-075 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. During the 2016 election cycle, Defendants Hillary for America ("HFA"), the authorized campaign committee of 2016 presidential candidate Hillary Clinton, and Correct the Record ("CTR"), a federal political committee organized to support Clinton's run, engaged in a multi-million dollar coordinated spending scheme designed to thwart the disclosure requirements and contribution limits of the Federal Election Campaign Act ("FECA or "Act"), 52 U.S.C. § 30101 *et seq.* As a result of this scheme, Correct the Record made, and Hillary for America accepted, millions of dollars in illegal, excessive, and unreported in-kind contributions in the form of coordinated expenditures. Plaintiff Campaign Legal Center ("CLC") is now bringing this action under 52 U.S.C. § 30109(a)(8)(C) to remedy Defendants' violations of the Act and obtain the

FECA-required disclosure information that Defendants are continuing to withhold from CLC and the voting public.

2.      Under FECA, expenditures that are coordinated with a candidate, or with her campaign or agents, are in-kind contributions to that candidate, and subject to the Act's comprehensive reporting requirements, contribution limits, and source restrictions. Upon establishing CTR, however, its founder and chair David Brock publicly declared that this supposedly independent "super PAC" would coordinate its activities with the Clinton campaign— and accept unlimited contributions from restricted sources—without running afoul of the Act. Brock claimed that CTR's planned coordination was permissible because CTR would engage exclusively in the types of unpaid internet communications that Federal Election Commission ("FEC") regulations exempt from the statutory coordination regime.

3.      Subsequent news reports quickly cast doubt on this pledge. Instead, the public record made clear that CTR and HFA were coordinating spending on a host of activities—such as campaign spokesperson training and media rapid-response efforts—that were "not fairly characterized as 'communications'" exempt from the coordination rules, as the FEC's Office of General Counsel ("OGC") later found.

4.      Ultimately, CTR spent more than $9 million dollars on activities ranging from opposition research to video production to press outreach, at least some portion of which were, by CTR's own admission, conducted in coordination with the Clinton campaign. But HFA never reported receiving in-kind contributions from CTR, and CTR never reported making such contributions.

5.       The Supreme Court has long recognized that coordinated expenditures function as "disguised contributions," and failure to regulate and require disclosure of them as such creates an

acute risk of corruption and deprives the public of valuable information about the true sources of candidates' financial support. *Buckley v. Valeo*, 424 U.S. 1, 46-47 (1976) (per curiam). Without the full and accurate reporting of coordinated expenditures as in-kind contributions to candidates, voters will not have the campaign finance information necessary to "place each candidate in the political spectrum," understand "the interests to which a candidate is most likely to be responsive," or make "predictions of future performance in office," *id.* at 67—all of which are crucial to casting an informed and meaningful vote.

6.     Defendants not only made excessive, prohibited in-kind contributions in violation of FECA's contribution limits and source restrictions but have also concealed this activity, thus depriving the electorate and Plaintiff CLC of comprehensive disclosure "as to where political campaign money comes from and how it is spent by the candidate." *Buckley*, 424 U.S. at 66.

7.     Plaintiff CLC has been, and continues to be, injured by Defendants' failure to disclose FECA-required information about CTR's in-kind contributions to the Clinton campaign—which, in turn, has deprived CLC of key information about the sources of the Clinton campaign's financial support, as well as the size and purposes of the campaign's expenditures. This is information to which CLC is legally entitled under FECA, and which CLC needs for work central to its mission, such as providing the public with information to aid the evaluation of candidates for federal office.

8.     This action follows the FEC's dismissal[1] of an administrative complaint filed by CLC and Catherine Hinckley Kelley alleging that CTR and HFA had violated the Act's contribution limits, source restrictions, and disclosure requirements, 52 U.S.C. §§ 30104(b),

---

[1] *See* Amended Certification in MURs 6940, 7097, 7146, 7160, and 7193 (Correct the Record) (signed June 13, 2019), https://www.fec.gov/files/legal/murs/7146/19044472151.pdf.

30116(a)(1), 30118(a). *See* Admin. Compl., MUR 7146 (Correct the Record) (Oct. 6, 2016), attached hereto as Exhibit 1. CLC and Ms. Kelley filed suit to challenge that dismissal and, on December 8, 2022, the U.S. District Court for the District of Columbia declared it "contrary to law" and remanded the matter for "the Commission to conform with [the] decision within 30 days." Mem. Op. at 19-20, *CLC v. FEC*, No. 1:19-cv-02336-JEB (D.D.C.), ECF No. 68.

9.     The Commission's 30-day conformance period expired without any action by the FEC to conform with the Court's order. Accordingly, Plaintiff CLC now brings this civil action against Correct the Record and Hillary for America "to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 52 U.S.C. § 30109(a)(8)(C) and 28 U.S.C. § 1331.

11.     The Court has personal jurisdiction over Defendant Correct the Record because it was incorporated in the District of Columbia during the 2016 election cycle. *See* Correct the Record: Initial File (Number: N00005199427), DC.gov, https://corponline.dcra.dc.gov/BizEntity.aspx/ViewEntityData?entityId=4153901 (last accessed Jan. 10, 2023); *see also Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

12.     This Court has personal jurisdiction over Defendants Correct the Record and Hillary for America pursuant to D.C. Official Code § 13-423, because both Defendants transact business within the District of Columbia, including the filing of campaign finance reports with the FEC. *See also* Fed. R. Civ. P. 4(k).

13.     Venue lies in this district under 28 U.S.C. § 1391(b)(1), (2), (c)(2).

14.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, and 52 U.S.C. § 30109(a).

## PARTIES

15.     Plaintiff CLC is a nonpartisan 501(c)(3) organization that works to strengthen the U.S. democratic process through, among other activities, protecting the public's right to access information about the financing of federal, state, and local election campaigns and the influence that campaign money has on governmental decisionmaking. To realize its mission of improving democracy and promoting representative, responsive, and accountable government for all citizens, CLC engages in litigation, regulatory practice, legislative policy, and public education. *See* CLC, *About CLC*, https://campaignlegal.org/about.

16.     CLC relies on the accurate and complete reporting of campaign finance information to carry out activities central to its mission, including research, analysis, and reporting about campaign spending and the true sources and scope of candidates' financial support.

17.     A central aspect of CLC's programmatic work, and a key way it advances its organizational mission, involves research regarding the money used to influence elections. Disclosure reports filed with the FEC are an important source of campaign finance information, which CLC uses for its fact-based legal analysis and evaluation of existing and proposed campaign finance laws, as well as to educate the public about the sources and extent of candidates' financial support so that voters can evaluate the full context of the political messages they hear. *See* CLC, *Issues: Campaign Finance*, https://campaignlegal.org/issues/campaign-finance.

18.     CLC also uses this analysis in its active docket of campaign finance cases in federal and state courts across the country.

19.     CLC is involved in litigation regarding campaign contribution limits, disclosure, political advertising, enforcement issues, and other campaign finance matters. Since representing the legislative sponsors of the Bipartisan Campaign Reform Act as intervenor-defendants in *McConnell v. FEC*, 540 U.S. 93 (2003), CLC has filed amicus briefs in every campaign finance case decided by the Supreme Court, including *McCutcheon v. FEC*, 572 U.S. 185 (2014), and *Citizens United v. FEC*, 558 U.S. 310 (2010).

20.     In addition, CLC uses its analyses of federal campaign finance disclosure data as the foundation for its administrative practice at the FEC and before state and local campaign finance agencies, and relies on this information when preparing administrative enforcement complaints and participating in rulemaking and advisory opinion proceedings.[2]

21.     CLC also uses information obtained from campaign finance disclosure reports in preparing testimony or public comment for Congress[3] or for state and local legislatures and agencies,[4] as well as to produce in-depth research reports and publications,[5] op-eds, blog posts,

---

[2] *See, e.g.*, CLC, *Letter to the FEC re: REG 2014-10 (Party Contribution Limits)* (May 19, 2019), https://campaignlegal.org/document/letter-fec-cromnibus-accounts (urging the FEC to issue rules defining permissible uses of funds from certain special-purpose "Cromnibus" accounts based on analysis of political party committees' disbursements from such accounts); CLC, *Petition for Rulemaking to Revise and Amend Regulations Relating to the Personal Use of Leadership PAC Funds* (July 24, 2018), https://campaignlegal.org/document/petition-fec-rulemaking-revise-and-amend-regulations-relating-personal-use-leadership-pac.

[3] *See, e.g.*, *Responses to Questions for the Record in Supp. of H.R. 1: Submitted to H. Comm. on the Judiciary*, 116th Cong. (2019), https://campaignlegal.org/document/congressional-testimony-support-hr-1-response-questions-record (testimony of Adav Noti, CLC senior director of trial litigation and chief of staff).

[4] *See, e.g.*, CLC, *Comments to Oklahoma Ethics Commission regarding Proposed Rule Amendments 2019-01*, https://www.ok.gov/ethics/documents/CLC%20Comments%20on%20 Proposed%20Rule%20Amendments.

[5] *See, e.g.*, Brendan Fischer & Maggie Christ, CLC, *FARA Zombies: How Some Retired Politicians Use Leftover Campaign Funds to Advance Their Careers as Foreign Agents* (2019), https:// campaignlegal.org/sites/default/files/2019-07/07-25-19%20FARA%20Zombie%20Report%20% 28final%29.pdf; Brendan Fischer & Maggie Christ, CLC, *Dodging Disclosure: How Super PACs*
(Continued...)

and other commentary through appearances on broadcast media and in interviews for print and web publications.[6] These communications are directed toward educating policymakers and the public about the true sources of money raised and spent to influence elections and the scale of candidate campaign spending, whether the money is contributed to or spent by candidates, political parties, other political committees, or non-committee individuals or entities.

22.     Similarly, CLC expends significant resources to assist reporters and other members of the media in their investigative research into candidates' financial support, to ensure that the public is equipped with the information necessary to evaluate different candidates and messages and to cast informed votes.

23.     Many of these press calls and contacts involve questions about the sources and amounts of funds being contributed to super PACs supporting specific candidates. This information is relevant to an analysis of the interests to which a candidate is likely to be responsive.

24.     When inadequate disclosure of federal campaign finance activity makes it difficult to ascertain the origin and magnitude of a candidate's financial support, as occurs when a candidate's fundraising and media operations are illegally outsourced to an "independent" super PAC without disclosure, reporters often contact CLC for guidance as to whether or where they can find the campaign finance information that is not being properly reported. This work requires CLC to divert resources and funds from other organizational needs.

25.     Defendant Correct the Record (ID # C00578997) is a federally registered political committee that operates as a hybrid "*Carey*" committee, *see infra* ¶ 50. According to its most

---

*Used Reporting Loopholes and Digital Disclaimer Gaps to Keep Voters in the Dark in the 2018 Midterms* (2018), https://campaignlegal.org/sites/default/files/2018-11/11-29-18%20Post-Election%20Report%20%281045%20am%29.pdf.

[6] For other examples of CLC's work, see http://www.campaignlegal.org.

recent Statement of Organization, its treasurer is Elizabeth Cohen. Statement of Organization, Correct the Record (Apr. 22, 2019), https://docquery.fec.gov/pdf/785/201904229149578785/201904229149578785.pdf.

26.     Defendant Hillary for America (ID# C00575795) is the authorized committee of Hillary Clinton's campaign for U.S. President in the 2016 election. According to its most recent Statement of Registration, its treasurer is Elizabeth Jones. Statement of Organization, Hillary for America (May 31, 2018), https://docquery.fec.gov/pdf/491/201805319113626491/201805319113626491.pdf. Jose H. Villarreal was HFA's treasurer when the activities described in this Complaint occurred.[7]

## LEGAL FRAMEWORK

### Statutory and Regulatory Definition of "Contribution"

27.     Under the Act, a "contribution" is a "gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). "Anything of value" includes "all in-kind contributions." 11 C.F.R. § 100.52(d)(1).

28.     In-kind contributions include "the payment . . . of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 52 U.S.C. § 30101(8)(A)(ii).

### Coordinated Expenditures Are In-Kind Contributions

29.     Any expenditure made in coordination with a candidate is an in-kind "contribution" to such candidate. "[E]xpenditures made by any person in cooperation, consultation, or concert,

---

[7] See First General Counsel's Report at 1, MURs 6940, 7097, 7146, 7160, and 7193 (Correct the Record) (Oct. 16, 2018) ("OGC Report"). The OGC Report is attached hereto as Exhibit 2.

with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents *shall be considered to be a contribution to such candidate*." 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added).

30.     The Supreme Court has endorsed this treatment of coordinated spending, accepting the proposition that "expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and . . . pose similar dangers of abuse." *Buckley*, 424 U.S. at 46.

31.     Because a coordinated expenditure is treated as an in-kind contribution to the candidate with whom it was coordinated, it is subject to the Act's contribution limits and source restrictions, as well as its related disclosure requirements.

32.     In the 2016 election cycle, federal law limited to $2,700 the amount of a contribution that a presidential candidate or the candidate's authorized campaign committee could accept from an individual donor or a non-multicandidate political committee. 52 U.S.C § 30116(a)(1)(A), (f); FEC, *Contribution limits for 2015-2016* (Feb. 3, 2015), https://www.fec. gov/updates/contribution-limits-for-2015-2016.

33.     FECA also prohibits a corporation or labor union from making a contribution to a federal candidate or political committee. 52 U.S.C. § 30118(a).

34.     Candidates and political committees are prohibited from knowingly accepting any contribution, including in-kind contributions in the form of coordinated expenditures, in violation of any restriction imposed on contributions under the Act. 11 C.F.R. § 110.9.

35.     FECA also requires all political committees to file regular reports with the Commission disclosing their receipts and disbursements, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(a)(1).

36.     For any political committee other than a candidate-authorized committee, such reports must include the total amount of contributions, including in-kind contributions, made to other political committees. 52 U.S.C. § 30104(b)(4)(H)(i). The report must also identify the name and address of each political committee that has received a contribution from the reporting committee during the reporting period, together with the date and amount of such contribution. *Id.* § 30104(b)(6)(B)(i).

37.     Candidate-authorized campaign committees must file reports disclosing all contributions received from other political committees, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(b)(2)(D). An in-kind contribution in the form of coordinated expenditures must be reported as both a contribution received and an expenditure made by the candidate. 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b).

38.     An in-kind contribution to a candidate from another committee must be itemized regardless of its amount as both a receipt and a disbursement. A candidate-authorized committee must report each in-kind contribution from a committee as an itemized receipt, and disclose the date and amount of the contribution, as well as the name and address of the contributor. 11 C.F.R. § 104.3(a)(4)(ii). The committee must also report an in-kind contribution as an itemized disbursement, and disclose the amount and date of the disbursement, the name and address of the recipient of the disbursement, and a description of its purpose. *Id.* § 104.3(b)(4)(i); *see also* FEC, *How to report: In-kind contributions*, https://www.fec.gov/help-candidates-and-committees/filing-reports/in-kind-contributions.

### *Definition and Regulation of Coordinated Expenditures*

39.     FECA defines a coordinated expenditure as one made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B)(i).

40.     FEC regulations define "coordination" in almost identical terms to mean "in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." 11 C.F.R. § 109.20(a).

41.     In addition to this broad "coordination" regulation, the Commission has also promulgated a regulation pertaining to a subset of coordinated expenditures—those made for certain "coordinated communications." 11 C.F.R. § 109.21.

42.     To be a "coordinated communication," a communication must (1) be paid for by a person other than the candidate, as described in 11 C.F.R. § 109.21(a)(1); (2) satisfy one of the "content standards" set forth in 11 C.F.R. § 109.21(c); and (3) satisfy one of the "conduct standards" set forth in 11 C.F.R. § 109.21(d).

43.     The "content standards" set forth in 11 C.F.R. § 109.21(c) all pertain to "public communications," a term the FEC has defined to mean a communication:

> [B]y means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising. The term general public political advertising shall not include communications over the Internet, except for communications placed for a fee on another person's Web site.

*Id*. § 100.26.

44.     The Commission's "coordinated communication" regulation at 11 C.F.R. § 109.21 thus applies only to expenditures for communications disseminated via media covered by the definition of "public communication" at 11 C.F.R. § 100.26.

45.     In 2006, the Commission promulgated internet rules that, among other things, created an "internet exception" from the definition of "public communications," 11 C.F.R. § 100.26, which exempted certain unpaid online communications but continued to encompass "communications placed for a fee on another person's Web site." Internet Communications, 71 Fed. Reg. 18589, 18613 (Apr. 12, 2006) (Final Rules with Explanation and Justification). The

intent of this internet rulemaking was to ensure that "individual citizens" were not impeded "from using the Internet to speak freely regarding candidates and elections," while at the same time sustaining the legal requirement that "political committees properly finance and disclose their Internet communications." *Id*. at 18589.

46.    As modified by the 2006 internet rulemaking, therefore, the coordinated communication regime provides that *unpaid* "communications over the Internet" are not "public communications" and thus are not covered by the definition of "coordinated communications." *Id.* §§ 100.26, 109.21.

47.    But all other types of expenditures, such as expenditures that do not constitute communications, are governed by the coordination regulation at 11 C.F.R. § 109.20. Under this regulation, any such expenditure will be treated as an in-kind contribution to a candidate if made "in cooperation, consultation or concert with, or at the request or suggestion of," a candidate or the candidate's campaign committee. 11 C.F.R. § 109.20.

### *FECA's Regulation of Political Committees*

48.    Generally, "non-connected" political committees—*i.e.*, committees that are not authorized by a candidate or political party—may not accept contributions from any source that, in the aggregate, exceed $5,000 in a calendar year. 52 U.S.C. § 30116(a)(1)(C). FECA also prohibits political committees from accepting contributions from corporations or labor unions. *Id.* § 30118(a).

49.    Following court decisions in *Citizens United* and *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), however, the FEC created a new class of political committees known as independent expenditure-only committees, or "super PACs." FEC Advisory Op. 2010-11 (Commonsense Ten) at 2-3. Political committees that "intend[] to make only independent

expenditures" but no "monetary or in-kind contributions (including coordinated communications) to any other political committee or organization" may solicit and accept unlimited contributions from individuals, corporations, labor organizations, and other committees. *Id.*

50.     In 2011, pursuant to the stipulated order and consent judgment in *Carey v. FEC*, No. 11-259-RMC (D.D.C. Aug. 19, 2011), the Commission allowed certain political committees to operate as "hybrid" committees that make both independent expenditures and campaign contributions from segregated accounts. FEC Statement on *Carey v. FEC*, Reporting Guidance for Political Committees that Maintain a Non-Contribution Account (Oct. 5, 2011), https://www.fec. gov/updates/fec-statement-on-carey-fec. A hybrid or "*Carey*" committee may establish (1) a "non-contribution" bank account that accepts contributions in unlimited amounts from individuals, corporations, labor organizations and other political committees that may be used only for independent expenditures—*not* for in-kind contributions to candidates; and (2) a separate "contribution" account subject to FECA's contribution limits and source prohibitions for making contributions to federal candidates. *Id.*

### Enforcement

51.     Any person may file a complaint with the FEC alleging a violation of FECA. 52 U.S.C. § 30109(a)(1). Commission regulations specify, in relevant part, that a complaint must identify the complainants and be sworn and signed, and that the allegations in a complaint "not based upon personal knowledge" should identify the source of the information that "gives rise to the complainant's belief in the truth of such." 11 C.F.R. § 111.4(b), (d).

52.     Any administrative complainant "aggrieved" by the FEC's dismissal of its complaint may seek review in this district, 52 U.S.C. § 30109(a)(8)(A), and the court "may declare that the dismissal of the complaint or the failure to act is contrary to law," *id.* § 30109(a)(8)(C). If

13

the court declares that the dismissal or failure to act is contrary to law, it "may direct the Commission to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C).

53.     If the FEC fails to conform to an order declaring its dismissal contrary to law, FECA provides that "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

## FACTUAL BACKGROUND

54.     To support Clinton's 2016 presidential campaign, CTR spent millions of dollars on opposition research, message development, surrogate training and booking, professional video production, and press outreach promoting Clinton's candidacy. CTR raised $9.63 million and spent $9.61 million during the 2016 election cycle.[8]

55.     By its own public admission, CTR undertook at least some of these activities in coordination with the Clinton campaign.[9] On information and belief, CTR therefore violated FECA by making, and HFA violated FECA by accepting, millions of dollars in prohibited, excessive, and unreported in-kind contributions.[10]

56.     According to the *Washington Post*, CTR split off from its parent organization, American Bridge, to become a "stand-alone super PAC" in May of 2015, and functioned as a

---

[8] *See* OGC Report at 8 (citing 2015-2016 Financial Summary, CTR, https://www.fec.gov/data/committee/C00578997/?cycle=2016).

[9] *See, e.g.*, OGC Report at 11 (citing December 12, 2016 Politico "Off Message" podcast with reporter Glenn Thrush ("Politico podcast"). The Politico podcast is available at https://podcasts.apple.com/us/podcast/david-brock-clinton-campaign-allowed-her-image-to-be/id987591126?i=1000378857971.

[10] CLC's administrative complaint, attached hereto as Exhibit 1, provides a lengthier description of CTR and HFA's activities during the campaign, including the widespread and contemporaneous news reporting on this subject.

hybrid committee, capable of making both independent expenditures and campaign contributions from segregated accounts.[11]

57.     CTR announced via press release on May 12, 2015 that it was a "strategic research and rapid response team designed to defend Hillary Clinton from baseless attacks," and would "be allowed to coordinate with campaigns and Party Committees" because it would "not be engaged in paid media."[12]

58.     CTR leadership publicly acknowledged that it worked in close coordination with HFA; for instance, CTR founder and chair David Brock explained that it was "under [HFA's] thumb" and provided "examples of how HFA would 'make sure' that CTR activity met HFA's needs."[13]

59.     But CTR asserted publicly, including to the FEC in response to CLC's administrative complaint, that its activities were exempt from the statutes and regulations governing coordination, on the theory that its operations were limited to unpaid communications over the Internet qualifying for the narrow regulatory "internet exemption" from the FEC's coordinated communications rule, see 11 C.F.R. §§ 100.26, 109.21.

60.     According to the *Washington Post*, "Correct the Record believes it can avoid the coordination ban by relying on a 2006 Federal Election Commission regulation that declared that content posted online for free, such as blogs, is off limits from regulation."[14] The *Wall Street*

---

[11] Matea Gold, *How a Super PAC Plans to Coordinate Directly with Hillary Clinton's Campaign*, Wash. Post (May 12, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/05/12/how-a-super-pac-plans-to-coordinate-directly-with-hillary-clintons-campaign.

[12] Admin. Compl. ¶ 12 (quoting Press Release, Correct the Record, Correct The Record Launches as New Pro-Clinton SuperPAC (May 12, 2015)).

[13] OGC Report at 17-18 (citing Politico podcast, *see supra* note 9).

[14] *See* Gold, *How a Super PAC Plans to Coordinate Directly with Hillary Clinton's Campaign*, *supra* note 11.

*Journal* similarly reported that "[b]y not making independent expenditures, the group said there are no restrictions on its ability to coordinate with Mrs. Clinton's campaign. The group will spend money on activities that can legally be coordinated with a campaign, such as social media, the [CTR] spokeswoman said."[15]

61.     But, as CTR expanded its operation, it became clear that the vast majority of CTR's activities did not involve communications or take place on the Internet at all.

62.     Based on news reports, CTR's public statements, and on information and belief, CTR made expenditures for numerous purposes that did not constitute communications or internet activities, including:

      a.     Paying staff to produce and circulate memos to reporters "detailing Republicans' stance on prescription drugs" on the same day that Clinton announced her health care policy.[16]

      b.     Paying staff to contact reporters by phone and email to offer "off the record" story pitches critiquing Clinton's primary election opponents, even as the Clinton campaign was stating publicly that it would not engage in such negative attacks.[17]

      c.     Paying staff to run a "30-person war room" to defend Clinton during hearings before the House Select Committee on Benghazi, which included "flood[ing] the

---

[15] Rebecca Ballhaus, *Pro Clinton Group Sets Novel Strategy*, Wall St. J. (May 12, 2015), https://www.wsj.com/articles/BL-WB-55199.

[16] *See, e.g.*, Admin. Compl. ¶ 25 (quoting Sam Frizell, *Clinton and Sanders Offer Competing Visions of Health Care*, Time (Sept. 22, 2015), https://time.com/4043242/hillary-clinton-bernie-sanders-health-care).

[17] *See, e.g.*, *id.* ¶ 34 (quoting Emilie Teresa Stigliani, *Clinton Super PAC Offers 'Off the Record' News Tips*, Burlington Free Press (Jan. 21, 2016), https://www.burlingtonfreepress.com/story/news/politics/2016/01/21/clinton-super-pac-offers-off-record-news-tips/79131372).

emails of Washington reporters with a running, blow-by-blow critique of Mrs. Clinton's contentious appearance" before the committee.[18]

       d.     Hiring and paying so-called "trackers" who were deployed in states across the country to discreetly record the public events of Clinton's opponents in the Democratic Party primaries.[19]

       e.     Paying staff to "develop relationships with Republicans" and "sleuth out confidential information from the Trump campaign" in order to distribute that information to reporters, including leaking drafts of Donald Trump's nomination speech before it took place.[20]

       f.     Paying staff to produce and distribute "an extensive prebuttal" memo to reporters in advance of a Trump speech and then "pepper[ing] reporters' inboxes with emails at the rate of about one every four minutes during the time Trump was speaking."[21]

---

[18] *See, e.g.*, *id.* ¶¶ 28-29 (quoting Eric Lichtblau, *Clinton 'Super PAC' Responds to Benghazi Hearings With 'Research Center' and a Flurry of News Releases*, N.Y. Times (Oct. 22, 2015), https://archive.nytimes.com/www.nytimes.com/politics/first-draft/2015/10/22/clinton-super-pac-responded-to-benghazi-hearings-with-research-center-and-a-flurry-of-news-releases; Lisa Lerer & Ken Thomas, *Analysis: Clinton Rides Skill, Luck Into Benghazi Hearing*, Associated Press (Oct. 22, 2015), *available at* https://www.realclearpolitics.com/articles/2015/10/22/analysis_clinton_rides_luck_skill_into_benghazi_hearing_128503.html).

[19] *See, e.g.*, *id.* ¶¶ 16-17 (citing Maggie Haberman, *'Tracker' Linked to Hillary Clinton Is Spotted at a Martin O'Malley Event*, N.Y. Times (July 16, 2015), https://archive.nytimes.com/www.nytimes.com/politics/first-draft/2015/07/16/tracker-linked-to-hillary-clinton-pac-is-spotted-at-a-martin-omalley-event; Alex Seitz-Wald, *Pro-Clinton super PAC keeps a close eye on rivals*, MSNBC (July 27, 2015), https://www.msnbc.com/msnbc/pro-clinton-super-pac-keeps-close-eye-rivals-msna648761).

[20] *See, e.g.*, *id.* ¶ 60 (quoting Kenneth P. Vogel & Julia Ioffe, *'Republican Source' Leaks Trump Speech to Dems*, Politico (July 21, 2016), https://www.politico.com/story/2016/07/rnc-2016-donald-trump-speech-leak-hillary-clinton-pac-225981).

[21] *See, e.g.*, *id.* ¶¶ 55-56 (quoting Gabriel Debenedetti, *Clinton allies circle the wagons against Trump speech*, Politico (June 22, 2016), https://www.politico.com/story/2016/06/hillary-clinton-allies-trump-224641; Niall Stanage, *Trump moves into presidential mode*, The Hill (Jun. 22, 2016),

            (Continued...)

g.      Contracting with consulting firms to provide "on-camera media training" for Clinton supporters, and to conduct an "aggressive surrogate booking program . . . in support of Hillary Clinton."[22]

h.      Commissioning a private polling firm to conduct polls showing that Clinton won the Democratic debate.[23]

i.      Making expenditures for professional media production, travel expenses, and personnel time to conduct "hundreds of interviews" across the country to portray Clinton in a positive light for a "Let's Talk Hillary" video project, and then pitching the video interviews to reporters.[24]

63.      CTR reported two small payments from the Clinton campaign for its services—including a $275,615 payment on June 1, 2015 described as "research: non-contribution account," and a $6,346 payment on July 17, 2015 described as "Payment for Research Services: Non Contribution Account"[25]—but these payments were dwarfed by CTR's total reported expenditures

---

https://thehill.com/blogs/ballot-box/presidential-races/284470-trump-moves-into-presidential-mode).

[22] *See, e.g.*, *id.* ¶ 15 (quoting Philip Rucker, *How Hillary Clinton's campaign fakes grassroots love*, N.Y. Post, July 8, 2015, https://nypost.com/2015/07/08/how-hillary-clintons-campaign-fakes-grassroots-love); *id.* ¶ 51 (quoting Mike Allen, *Politico Playbook (June 17)*, Politico (June 17, 2016), https://www.politico.com/tipsheets/playbook/2016/06/clintonites-join-dnc-sanders-loses-leverage-trump-touts-campaign-of-substance-bush-43-unlikely-savior-bday-desiree-barnes-story-burch-newt-gingrich-matt-miller-214873).

[23] *See, e.g.*, *id.* ¶ 31 (citing, *inter alia*, Emilie Teresa Stigliani, *Sanders camp questions poll showing Clinton won debate*, Burlington Free Press (Nov. 17, 2015), https://www.burlingtonfreepress.com/story/news/politics/2015/11/15/poll-clinton-won-2nd-democratic-debate/75822694).

[24] *See, e.g.*, *id.* ¶ 30 (quoting Phillip Rucker, *Super PAC Launches 'Let's Talk Hillary' to Reveal Softer Side of Clinton*, Wash. Post (Oct. 25, 2015), https://www.washingtonpost.com/politics/super-pac-launches-lets-talk-hillary-to-reveal-a-softer-side-of-clinton/2015/10/25/3ba216ae-7b3c-11e5-afce-2afd1d3eb896_story.html).

[25] *See* CTR Mid-Year Report 2015, FEC Form 3X: Report of Receipts and Disbursements (Continued...)

in the relevant period, and most likely by CTR's coordinated expenditures (although the total amount of the latter remains unknown).

64.     Many of these reported activities either did not utilize the internet, or, at most, supported an internet communication exempt under 11 C.F.R. § 100.26 only indirectly or in part, such as opposition research that may have supported both CTR's offline public relations efforts and its social media postings.

65.     Indeed, most of CTR's reported disbursements did not even relate to "communications" at all, but went toward general overhead expenses like "payroll, salary, travel, lodging, meals, rent, fundraising consulting, computers, digital software, domain services, email services, equipment, event tickets, hardware, insurance, office supplies, parking, and shipping." OGC Report at 9.

66.     The nature of CTR's reported expenditures and the "scale of the close coordination" between CTR and HFA "suggests that most of CTR's entire range of activity during 2015-16 represents coordinated expenditures" that did not qualify for the internet exemption, and therefore constituted "unreported excessive and prohibited in-kind contributions" to HFA. OGC Report at 25.

### Exhaustion of Administrative Remedies

67.     CLC and Catherine Hinckley Kelley filed a sworn administrative complaint with the FEC on October 6, 2016 alleging that CTR made, and HFA accepted, unreported, excessive, and prohibited in-kind contributions in the form of coordinated expenditures and compensation for

---

(reporting period 01/01/15 to 06/31/15), at Schedule A, https://docquery.fec.gov/cgi-bin/forms/C00578997/1020148/sa/ALL; CTR Year-End Report 2015, FEC Form 3X: Report of Receipts and Disbursements (reporting period 07/01/15 to 12/31/15), at Schedule A, https://docquery.fec.gov/cgi-bin/forms/C00578997/1046461/sa/ALL.

personal services, in violation of FECA's disclosure requirements, 52 U.S.C. § 30104(b),

contribution limits, *id.* § 30116(a)(1), and source restrictions, *id.* § 30118(a) and (b)(2).

68.     Based on CLC's administrative complaint, three other similar complaints filed by

different complainants, the respondents' written replies, and other available evidence, the FEC's

Office of General Counsel ("OGC") recommended that the Commission find reason to believe that

CTR violated 52 U.S.C. §§ 30116(a), 30118(a), and 30104(b) by making excessive and prohibited

in-kind contributions to the Clinton campaign and failing to report them; and that HFA violated

52 U.S.C. §§ 30116(f), 30118(a), and 30104(b) by accepting and failing to report those

contributions.

69.     As OGC noted, CTR did not dispute "the description or scope of its activities on

behalf of [the Clinton campaign] as set forth in" CLC's complaint. OGC Report at 10 n.28. OGC

concluded—citing, *inter alia*, CTR's press releases and its representatives' statements to the

media—that "CTR systematically coordinated with [the Clinton campaign] on its activities," *id.* at

7-8, 16, and available evidence "suggest[ed] that most of CTR's entire range of activity during

2015-16 represents coordinated expenditures and therefore a contribution to [the Clinton

campaign]," *id.* at 25.

70.     The Commission, despite the well-founded allegations in the administrative

complaint and contrary to the recommendation of its OGC, dismissed the complaint on June 4,

2019, after deadlocking 2-2 on whether to find reason to believe that CTR or HFA violated FECA.

*See* Amended Certification at 1-2, MURs 6940, 7097, 7146, 7160, and 7193 (Correct the Record)

(signed June 13, 2019).

71.     CLC and Ms. Kelley timely filed an action on August 2, 2019 under 52 U.S.C.

§ 30109(a)(8) and the Administrative Procedure Act ("APA") to challenge the dismissal of their

FEC complaint as contrary to law. Compl., *CLC v. FEC*, 1:19-cv-02336-JEB (D.D.C), ECF No. 1; *see also* Am. Compl., ECF No. 15.

72.     The FEC did not appear in or present any defenses to plaintiffs' action. CTR and HFA, however, sought and were granted the right to intervene as defendants, *CLC v. FEC*, 334 F.R.D. 1 (D.D.C. 2019), and vigorously defended the dismissal throughout the three years of litigation that ensued.

73.     Ultimately, the district court, following the D.C. Circuit's confirmation that plaintiffs had established standing by "demonstrat[ing] a quintessential informational injury," *CLC v. FEC*, 31 F.4th 781, 784 (D.C. Cir. 2022), granted summary judgment in favor of plaintiffs. *See* Mem. Op., *CLC v. FEC*, 1:19-cv-02336-JEB (D.D.C. Dec. 8, 2022), ECF No. 68. The Court concluded that the FEC's basis for the dismissal was contrary to law because it was "doubly flawed: first it failed to define any limits on when 'inputs' to online exempted communications themselves become offline in-kind contributions, and second because its analysis of CTR's offline activities flagrantly disregarded key pieces of evidence." *Id.* at 10.

74.     With respect to the FEC's interpretation of the internet exemption, the Court concluded that "the Commission's opinion would create a loophole . . . through which a truck could drive," as its "self-described 'bright-line rule' excluding from regulation any input to an unpaid online communication would seemingly allow any coordinated expenditure to escape treatment as a contribution, so long as that expenditure somehow informs a blog post or improves a tweet." *Id.* Such a "massive expansion of the exception that essentially swallows the rule" would "contravene[] FECA's plain language," as well as Commission precedent. *Id.* at 11-13.

75.     The Court also found that the FEC's dismissal was arbitrary and capricious because the controlling Commissioners disregarded significant record evidence of coordination with

respect to CTR's offline activities, which undisputedly did not qualify for the internet exemption. *See id.* at 15 ("The Commission's [OGC] documented substantial evidence, both leaked and public, of systematic coordination between HFA and CTR.").

76.     The Court concluded that "[b]ecause the Commission's decision was based on an impermissible interpretation of the Act and was otherwise arbitrary and capricious, its dismissal of Plaintiffs' complaint was contrary to law." *Id.* at 19. It remanded the matter for "the Commission to conform with this decision within 30 days." *Id*. at 20. The FEC's deadline to conform was January 7, 2022.

77.     On December 21, 2022, the FEC appeared for the first time in the case, noticed its appeal of the Court's December 8 remand order and opinion, and filed a motion for a stay pending appeal. *See* FEC Mot. for Stay, *CLC v. FEC*, 1:19-cv-02336-JEB, ECF No. 73. Briefing on the motion for stay concluded on January 6, 2022, but to date, no stay or continuance of the FEC's deadline to conform has issued.

78.     The Commission's 30-day period to conform with the Court's order has now expired, and the FEC has neither acted on the remanded complaint nor provided any indication that it has or will otherwise take steps to conform.

## COUNT I

### CTR MADE AND HFA ACCEPTED EXCESSIVE AND PROHIBITED IN-KIND CONTRIBUTIONS, IN VIOLATION OF 52 U.S.C. §§ 30116 AND 30118

79.     Plaintiff realleges and incorporates by reference paragraphs 1 to 78 as if fully set forth herein.

80.     Any expenditure made in coordination with a candidate is an in-kind "contribution" to such candidate. *See* 52 U.S.C. § 30116(a)(7)(B)(i) ("expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his

authorized political committees, or their agents shall be considered to be a contribution to such candidate"); 11 C.F.R. § 109.20(a). Because a "coordinated" expenditure is an in-kind contribution to the candidate with whom it was coordinated, it is subject to the Act's contribution limits and source restrictions, as well as its related disclosure requirements.

81.     In the 2016 election cycle, federal law limited to $2,700 the contribution that a presidential candidate or the candidate's authorized campaign committee could accept from an individual donor or a non-multicandidate political committee. 52 U.S.C § 30116(a)(1)(A), (f). FECA also prohibits a corporation or labor union from making a contribution to a federal candidate or political committee. 52 U.S.C. § 30118(a).

82.     During the 2016 election cycle, CTR made excessive and prohibited in-kind contributions to HFA—in the form of coordinated expenditures, compensation for personal services, and other things of value—in violation of 52 U.S.C. §§ 30116(a) and 30118(a); and HFA accepted those excessive and prohibited in-kind contributions, in violation of 52 U.S.C. §§ 30116(f) and 30118(a).

## COUNT II

### CTR AND HFA HAVE VIOLATED FECA'S REPORTING REQUIREMENTS, 52 U.S.C. § 30104

83.     Plaintiff realleges and incorporates by reference paragraphs 1 to 82 as if fully set forth herein.

84.     FECA requires all political committees to file regular reports with the Commission disclosing their receipts and disbursements, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(a)(1).

85.     For any political committee other than a candidate-authorized committee, such reports must include the total amount of contributions, including in-kind contributions, made to

other political committees, and must identify the name and address of each political committee that has received a contribution from the reporting committee during the reporting period, together with the date and amount of such contribution. 52 U.S.C. § 30104(b)(4)(H)(i), (b)(6)(B)(i).

86.     Candidate-authorized campaign committees must file reports disclosing all contributions received from other political committees, including in-kind contributions in the form of coordinated expenditures, which must be reported as both a contribution received, and an expenditure made by the candidate. 52 U.S.C. § 30104(b)(2)(D); 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b).

87.     During the 2016 election cycle, CTR made but failed to report making in-kind contributions to HFA, and HFA accepted but failed to report its receipt of such contributions, in violation of 52 U.S.C. § 30104(b).

88.     By failing to disclose the information required by FECA, Defendants have harmed and continue to harm Plaintiff CLC by depriving CLC of information to which it is statutorily entitled, and which CLC uses to carry out its organizational mission, including assisting voters in evaluating candidates for public office.

## REQUESTED RELIEF

WHEREFORE, Plaintiff, by its undersigned counsel, respectfully requests that the Court grant the following relief:

a)     Declare that Defendant CTR made excessive and illegal in-kind contributions to Defendant HFA, in the form of coordinated expenditures, compensation for personal services, and other things of value; and that HFA received excessive and prohibited contributions from CTR in the 2016 election cycle;

b)     Declare that Defendants failed to report making and/or receiving such excessive and illegal in-kind contributions as FECA and FEC regulations require;

c)      Order Defendants CTR and HFA to provide Plaintiff, via public filing with the FEC, with the information to which it is legally entitled under FECA and FEC regulations;

d)      Order Defendants CTR and HFA to amend their existing FEC disclosure reports to include complete and correct information about any in-kind contributions, in the form of coordinated expenditures, compensation for personal services, and other things of value, made by CTR and/or received by HFA, and to file such amended reports with the FEC for each reporting period in which they were required to file;

e) Award Plaintiff its costs and reasonable attorneys' fees in this action; and

f) Grant such other relief the Court may deem just and proper.

Dated: January 10, 2023

Respectfully submitted,

*/s/ Tara Malloy*

Tara Malloy (DC Bar No. 988280)
Megan P. McAllen (DC Bar No. 1020509)
CAMPAIGN LEGAL CENTER
1101 14TH ST. NW, SUITE 400
WASHINGTON, D.C. 20005
(202) 736-2200